UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| OFFICE SOURCE, INC., | ) | Bankruptcy Case No. 09-34901-HRT |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| JEFFREY A. WEINMAN, Chapter 7 Trustee, | ) | Adv. Pro. No. 11-01858-HRT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NEW PENN MOTOR EXPRESS, INC., | ) | |
| a Pennsylvania corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| JEFFREY A. WEINMAN, Chapter 7 Trustee, | ) | Adv. Pro. No. 11-01869-HRT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| YRC WORLDWIDE, INC., dba YRC (RDWY) | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court has consolidated these two adversary proceedings in the Chapter 7 case of Office Source, Inc. (the "Debtor") for purposes of this opinion because of similarities in the factual backgrounds and legal issues of each proceeding. Both matters are before the Court on the Trustee's Complaints seeking the recovery of alleged preferential payments made by the Debtor to New Penn Motor Express, Inc. ("New Penn") and YRC Worldwide, Inc. ("YRC") (collectively, the "Defendants") during the 90 days preceding

1

the Debtor's bankruptcy petition. The Defendants argue that the Debtor paid and the Defendants received the challenged transfers in the ordinary course of business.

## FACTUAL BACKGROUND

The facts concerning the Debtor's relationship with both New Penn and YRC are largely the same. Both Defendants are in the business of shipping freight for third parties, one of which was the Debtor. In particular, the Defendants are what are commonly referred to as "less than load" carriers. The phrase "less than load" means that in each truckload, the Defendants carry freight for multiple clients.

During the course of the Debtor's relationship with the Defendants, the Defendants would pick up shipments from the Debtor's place of business and bring those shipments to a terminal. At the terminal, the Defendants would generate an invoice for each shipment and prepare those shipments for delivery to their final destinations, which was indicated on a bill of lading. The Defendants would send a paper copy of each invoice to the Debtor and keep an electronic copy of each invoice for their own records. Neither Defendant kept paper copies of the invoices sent to clients. Instead, the Defendants relied solely on electronic records and kept those records for seven years.

According to the terms of each invoice, the Debtor was obligated to pay for the cost of each shipment within a fixed period of time. Under the terms of New Penn's invoices, payment was due on or before 30 days from the date of the invoice. Under the terms of YRC's invoices, payment was due on or before 15 days from the date of the invoice. If the Debtor did not pay by the deadline, the Defendants would initiate collection efforts. Ordinarily, New Penn would initiate collection efforts for accounts that were more 30 days past due while YRC would initiate collection efforts for accounts that were only four days past due. For both Defendants, collection efforts consisted of phone calls and letters until the Debtor brought its account current.

While the Defendants generated a separate invoice for each shipment, the Debtor did not pay these invoices with separate checks; rather, the Debtor would pay multiple invoices with a single, periodic check. Given the Debtor's payment practice, it was not uncommon for a single check to pay for numerous invoices with widely varying due dates. These varying due dates and payment dates are the subject of the present dispute.

The Debtor filed for bankruptcy on November 20, 2009. In the 90 days prior to the filing of the Debtor's bankruptcy petition (the "Preference Period"), the Trustee alleges that the Debtor changed its ordinary course of dealing with the Defendants and began to pay the Defendants' invoices differently than it had previously. According to the Trustee, the timeliness of the Debtor's payments during the Preference Period vary

significantly enough from the Debtor's ordinary course of dealing with the Defendants to constitute preference payments. As such, the Trustee seeks to recover those payments from the Defendants for the benefit of the Debtor's other creditors. In total, the Trustee seeks to recover $95,587.02 from New Penn and $49,326.30 from YRC.

The Court held a trial on the Trustee's preference actions against both Defendants on August 19, 2013. At trial, the Defendants stipulated to the Trustee's respective prima facie cases, and both Defendants asserted the affirmative defense that they received the payments pursuant to the parties' ordinary course of business. In addition, the parties stipulated to the amount of new value provided by the Defendants to the Debtor. The parties agree that New Penn provided the Debtor with new value of $21,939.28 and that YRC provided the Debtor with new value of $3,540.25.

In support of their defenses, the Defendants sought to establish the baseline for their respective dealings with the Debtor over the year prior to the Preference Period (the "Pre-Preference Period"). To establish this baseline, the Defendants sought to introduce reports that showed how timely the Debtor paid the Defendants' invoices during both the Pre-Preference and Preference Periods. To authenticate these reports, the Defendants called employees of New Penn and YRC to testify as to how the data that formed the basis for the reports was created and stored. The Trustee objected to the admission of the Defendants' reports on the basis that the data upon which the reports were based was not disclosed to the Trustee in a timely fashion. The Court took the Trustee's objection under advisement and conditionally admitted the Defendants' reports for purposes of hearing the evidence and concluding the trial. At the conclusion of trial, the Court took the matter under advisement.

## DISCUSSION

### I.     Admission of Summary Reports under Federal Rule of Evidence 1006

Before the Court can decide the preference issues, as a necessary prerequisite, it must decide whether to admit the summary reports offered by the Defendants at trial. The summary reports contain data from invoices that are stored on the Defendants' computer servers. When summarized, the data provides information on how timely the Debtor paid its invoices during both the one-year Pre-Preference Periods and the 90-day Preference Periods. The Defendants created these reports for the purpose of establishing the baseline course of dealing between the Defendants and the Debtor. Such a baseline is necessary for the Defendants to assert their defense that they received the alleged preference payments pursuant to the parties' ordinary course of business. The Trustee objects to the admission of the summary reports pursuant to Fed. R. Evid. 1006,

3

incorporated in bankruptcy cases by Fed. R. Bankr. P. 9017. Further, the Trustee argued that the Defendants failed to lay the proper foundation for admission of the documents upon which the summary is based. Under Rule 1006:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006.

At trial, the Trustee agreed that the reports summarize voluminous documents. However, the Trustee argued against admission of the summary reports because the Defendants did not disclose the existence of computer records or otherwise make those computer records available for the Trustee's inspection. Further, the Trustee argued that the Defendants failed to lay the proper foundation for admission of the documents upon which the summaries are based. The Court will address each of the Trustee's arguments separately.

### A. Disclosure and Availability of Underlying Documents

In response to the Trustee's disclosure-based objection, the Defendants introduced as evidence copies of the Initial Disclosures and Response to Interrogatories for both New Penn and YRC. With regard to the Initial Disclosures of both New Penn and YRC, Fed. R. Civ. P. 26(a)(1)(A)(ii), incorporated herein by Fed. R. Bankr. P. 7026, requires the Defendants to provide the Trustee with:

> a copy – or description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment

On page two of their respective Initial Disclosures, both New Penn and YRC disclosed the existence of "computer records and documents necessary to establish the defenses set forth in [the Defendant's] Answer" and provided the address where those computer records were maintained.

Additionally, with regard to the Defendants' respective Response to Interrogatories, the Defendants, citing the burdensome reality of complying with the request, repeatedly objected to the production of documents, including invoices and payment receipts. Importantly, the Defendants did not deny the existence of such documents. Further, when asked to produce the computer records that were disclosed in the Defendants' Initial Disclosures, the Defendants, citing the burdensome nature of the request, offered to make the requested computer records available at a "mutually convenient time and place."

Based on the Defendants' Initial Disclosures and Response to Interrogatories, the Court is satisfied that the Trustee had adequate notice of the existence of computer records and that the Defendants provided adequate access to the records by offering to make the records in question available at a mutually convenient time and place. Thus, the Court finds that the Defendants have complied with the disclosure elements of Rule 1006.

### B. Foundation for Admission of Summarized Documents

While the Court finds that the Defendants have complied with the disclosure and availability requirements of Rule 1006, before the Court may admit the summary reports, it must ensure that the Defendants have laid the proper foundation as to the admissibility of the summarized material and ensure that the summary is accurate. *Needham v. White Laboratories, Inc.*, 639 F.2d 394, 403 (7th Cir. 1981).

To authenticate the invoices that underlie the summary reports, the Defendants presented the testimony of employees familiar with their invoicing processes. New Penn called Deborah Perlaki to testify. For the past 12 years, Ms. Perlaki has served as the Manager of New Penn's Credit and Collections Department. YRC called Michelle Gage to testify. Ms. Gage is YRC's Credit Risk Manager and the former Collections Manager. Both witnesses demonstrated their familiarity with the Defendants' billing and invoicing processes. The witnesses explained how their respective employers' invoices are generated and stored. According to both witnesses, the Defendants stored past invoice data on computers and did not retain paper copies. After hearing the witnesses' testimony and the Trustee's cross examination, it is clear to the Court that the witnesses are well versed in the Defendants' invoicing processes. Further, the Court is satisfied that, based on the testimony of each witness, the Defendants' invoices are generated and the associated information stored in the ordinary course of the Defendants' businesses and are business records.

In addition to providing testimony on how the underlying invoices are generated and stored, the witnesses also provided testimony on how the summary reports were generated. According to the witnesses, such summary reports were not standard and had to be specially created. The witnesses testified that each summary report accurately represented the data contained in the underlying invoices. The Trustee was unable to impeach the credibility of the witnesses or the accuracy of the summary reports, and the Court is satisfied that the Defendants have laid the proper foundation for the admissibility and accuracy of the summary reports. Accordingly, the Court will admit them into evidence. These admitted summary reports include New Penn Exhibits C and D and YRC Exhibits D and E.

## II.    Preference Payments

In the 90 days prior to the Debtor's bankruptcy petition (the "Preference Period"), the Trustee alleges that the Debtor changed its ordinary course of dealing with the Defendants and began to pay the Defendants' invoices differently than it had previously. According to the Trustee, the timeliness of the Debtor's payments during the Preference Period varies significantly enough from the Debtor's ordinary course of dealing with the Defendants to constitute preference payments. As such, the Trustee seeks to recover those payments from the Defendants for the benefit of the Debtor's other creditors. In total, the Trustee seeks to recover $95,587.02 from New Penn and $49,326.30 from YRC.

Section 547 of the Code governs the recovery of preference payments. Section 547(b) sets forth the elements of the Trustee's prima facie case and provides:

> [T]he trustee may avoid any transfer of an interest of the debtor in property –
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made –
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if –
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and

6

      (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

At trial, the Defendants conceded all of the elements of the Trustee's prima facie case, and the Court finds the Trustee's prima facie case established. The Court thus turns to the Defendants' asserted affirmative defense under § 547(c)(2)(A), which provides a safe harbor for transfers "made in the ordinary course of business **or** financial affairs of the debtor and the transferee[.]" 11 U.S.C. § 547(c)(2)(A) (emphasis added).

Prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), a preference defendant asserting an "ordinary course of business" defense had to show both that the transfers were ordinary as between the parties **and** that the transfers were ordinary in the relevant industry, which required a defendant to provide evidence of prevailing practice among similarly situated members of the industry facing the same or similar problems. *See Payne v. Clarendon National Ins. Co. (In re Sunset Sales, Inc.)*, 220 B.R. 1005 (10th Cir. B.A.P. 1998) (a pre-BAPCPA case); *see generally* Charles J. Tabb, *The Brave New World of Bankruptcy Preferences*, 13 Am. Bankr. Inst. L. Rev. 425 (2005) (discussing changes made by BAPCPA). With the change made in the BAPCPA, from "and" to "or," Congress significantly eased the burden on defendants asserting an ordinary course of business defense.

Here, the parties have focused on the ordinary course of business between the parties, as set forth in § 547(c)(2)(A). The Defendants bear the burden of proving the defense by a preponderance of the evidence. *In re Allied Carriers' Exchange, Inc.*, 375 B.R. 610, 616 (10th Cir. B.A.P. 2007). The defense should be narrowly construed. *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1339 (10th Cir. 1996).

When determining the ordinary course of the parties' business under § 547(c)(2)(A), courts apply a "subjective" standard, looking to the way the parties actually conducted their business dealings. *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991); *Tulsa Litho Company v. BRW Paper Co., Inc. (In re Tulsa Litho Company)*, 299 B.R. 806, 810 (10th Cir. B.A.P. 1999). In considering whether the transfers occurred according to the ordinary course of the parties' business, courts in the Tenth Circuit must consider the following four factors:

    (1) the length of time the parties were engaged in the transaction in issue;
    (2) whether the amount or form of tender differed from past practices;
    (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and
    (4) the circumstances under which the payment was made.

*Sunset Sales, Inc. v. Clarendon National Insurance Company (In re Sunset Sales)*, 220 B.R. 1005, 1020-21 (10th Cir. B.A.P. 1998). Courts typically consider these factors by comparing pre-preference period transfers with preference period transfers. *Id.* at 1021. "Although there are four factors, courts often focus upon one of these factors and any significant alteration in any one of the factors may be sufficient to conclude that a payment was made outside the ordinary course of business." *In re Furr's Supermarkets*, 373 B.R. 691, 706 (10th Cir. B.A.P. 2007) (internal quotation marks omitted). The Court will consider separately the transfers to New Penn and to YRC.

### A. The Preference Period Transfers to New Penn

The Trustee alleges that the following transfers made by the Debtor to New Penn during the 90 days prior to the petition date are recoverable preferences:

| Check Number | Check Amount | Date of Check |
|---|---|---|
| 312446 | $11,344.18 | 8/19/2009 |
| 312516 | $17,095.13 | 8/28/2009 |
| 312707 | $16,298.44 | 8/31/2009 |
| 312784 | $8,488.70 | 9/2/2009 |
| 313010 | $5,190.39 | 9/14/2009 |
| 313136 | $3,597.94 | 9/17/2009 |
| 313327 | $8,956.80 | 9/28/2009 |
| 313467 | $1,518.87 | 10/12/2009 |
| 313597 | $7,018.93 | 10/15/2009 |
| 314113 | $16,078.64 | 11/13/2009 |

An analysis of the above checks reveals that these checks paid a total of 767 New Penn invoices, with each check paying between 11 and 140 invoices. On average, each check paid 77 invoices. These checks paid invoices as early as 15 days and as late as 71 days, with the average payment arriving within 41 days of the date of the invoice.

In comparison, an analysis of the transfers made by the Debtor to New Penn during the Pre-Preference Period reveals that during the year prior to the Preference Period, the Debtor sent 32 checks to New Penn that paid a total of 2,287 invoices, with each check paying between one and 187 invoices. On average, each check paid 72 invoices. These checks paid invoices as early as 23 days and as late as 176 days, with the average payment arriving within 60 days of the date of the invoice. During both the preference and Pre-Preference Periods, the contractual terms of each invoice required payment in 30 days from the date of the invoice.

The Court first considers the first factor set forth in *Sunset Sales*: the length of time the parties were engaged in the transaction at issue. Here, the Court finds that the one-year period of transactions included in the Pre-Preference Period is sufficient for the Court to compare the Pre-Preference Period transactions with the Preference Period transactions. This is not a case where the challenged transfers represent the only dealings between the parties. *Cf. Rushton v. SMC Electrical Products, Inc. (In re C.W. Mining Co.)*, 500 B.R. 635 (10th Cir. B.A.P. 2013).

The Court next considers the second factor: whether the amount or form of tender differed from past practices. The form of tender, Debtor's payment by check covering a variety of invoices, did not vary from the Pre-Preference Period to the Preference Period.

The Court considers together the third and fourth factors: whether the debtor or creditor engaged in any unusual collection or payment activity, and the circumstances under which the payment was made. For the latter, the Court will focus on the timing of the payment of invoices. During the Pre-Preference Period, the number of invoices that the Debtor paid with a single check varied from 1 to 187 invoices, paid from 7 days early to 146 days late. During the Preference Period, the number of invoices that the Debtor paid with a single check varied from 11 to 140 invoices, paid from 19 days early to 41 days late. During the Pre-Preference Period, the Debtor paid 2,287 New Penn invoices. Of these 2,287 invoices, the Debtor paid only one before its contractual due date of 30 days. In contrast, during the Preference Period, the Debtor paid 151 of 767 (almost 20%) invoices within 30 days. During the Preference Period, on average, the Debtor paid New Penn's invoices within 41 days, while during the Pre-Preference Period, on average, the Debtor paid New Penn's invoices within 60 days. The average payment during the Preference Period was made over 33% faster than that during the Pre-Preference Period.

The Court does not find that the payment timing difference resulted from unusual collection activity of New Penn. According to testimony of Deborah Perlaki, New Penn's Manager of Credit and Collections for 12 years, New Penn did not send an invoice to collections until the invoice was more than 60 days late. Once in collections, the only action taken to collect the debt was a phone call. Even after a payment was more than 90 days late, New Penn did not engage in any collection activity other than phone calls and never threatened litigation to recover payment. Courts have found that mere phone calls and letters, without more, do not rise to the level of unusual collection activities triggering a divergence from a creditor's ordinary course of business. *See Grant v. Suntrust Bank, N.A. (In re L. Bee Furniture Co.)*, 203 B.R. 778, 782 (Bankr. M.D.Fla. 1996); *In re Jack's Construction, Inc.*, 2011 WL 1321386, *6 (Bankr. D.N.M. April 6, 2011). But, the Court's conclusion that New Penn did not engage in unusual

9

collection activity does not end the Court's inquiry; the Court must also consider whether the Debtor engaged in unusual payment activity.

Here, the Court finds that the difference between the payments made during the Pre-Preference Period and those made during the Preference Period is sufficiently significant to constitute "unusual payment activity" on the Debtor's part. Although typically, unusual payment activity consists of payments made later than usual, the Court finds the distinction between unusually early payments and unusually late payments to be one without a difference. Other courts have found that early payments, even in the absence of unusual collection activity, support a conclusion of "unacceptable favoritism" on a debtor's part, resulting in a finding that the payments were not made in the ordinary course of the parties' business. *See, e.g., Cellmark Paper, Inc. v. Ames Merch. Corp. (In re Ames Dept. Stores, Inc.)*, 470 B.R. 280, 285 (S.D.N.Y.2012); *Jacobs v. Gramercy Jewelry Mfg. Corp. (In re M. Fabrikant & Sons, Inc.)*, Adv. No. 08–1690, 2010 WL 4622449, at *4–5 (Bankr. S.D.N.Y. Nov. 04, 2010).

The ordinary course of business defense is narrowly construed, and "any significant alteration in any one of the factors may be sufficient to conclude that a payment was made outside the ordinary course of business." *In re Furr's Supermarkets*, 373 B.R. at 706. Here, the marked acceleration in the Debtor's periodic payments is sufficient to remove the payments made during the Preference Period from the parties' ordinary course of business. The Court finds that New Penn has not met its burden of establishing an ordinary course of business defense. The Trustee is entitled to recover the total of the payments made during the Preference Period, $95,587.02, offset by the new value provided by New Penn to the Debtor, which the parties stipulate amounts to $21,939.28.

### B. The Preference Period Transfers to YRC

The Trustee alleges that the following transfers made by the Debtor to YRC during the 90 days prior to the petition date are recoverable preferences:

| Check Number | Check Amount | Date of Check |
|---|---|---|
| 312461 | $3,884.93 | 8/19/2009 |
| 312693 | $2,454.00 | 8/28/2009 |
| 312908 | $8,346.93 | 9/2/2009 |
| 313055 | $6,376.97 | 9/14/2009 |
| 313160 | $8,139.92 | 9/17/2009 |
| 313241 | $5,976.10 | 9/28/2009 |
| 313459 | $5,979.19 | 10/12/2009 |
| 313569 | $2,279.89 | 10/15/2009 |

    314112        $5,888.37        11/13/2009

An analysis of the above checks reveals that these checks paid a total of 159 YRC invoices, with each check paying between 7 and 26 invoices. On average, each check paid 16 invoices. These checks paid invoices as early as 18 days and as late as 180 days, with the average payment arriving within 48 days of the date of the invoice.

  In comparison, an analysis of the transfers made by the Debtor to YRC during the Pre-Preference Period reveals that during the year prior to the Preference Period, the Debtor sent 16 checks to New Penn that paid a total of 144 invoices, with each check paying between one and 28 invoices. On average, each check paid 9 invoices. These checks paid invoices as early as 21 days and as late as 184 days, with the average payment arriving within 52 days of the date of the invoice. During both the Preference and Pre-Preference Periods, the contractual terms of each invoice required payment in 15 days from the date of the invoice.

  Considering the first *Sunset Sales* factor, the length of time the parties were engaged in the transaction at issue, the Court finds that the one-year period of transactions included in the Pre-Preference Period is sufficient for the Court to compare the Pre-Preference Period transactions with the Preference Period transactions. As noted above in the discussion of the transfers to New Penn, this is not a case where the challenged transfers represent the only dealings between the parties. *Cf. Rushton v. SMC Electrical Products, Inc. (In re C.W. Mining Co.)*, 500 B.R. 635 (10th Cir. B.A.P. 2013).

  The Court next considers the second *Sunset Sales* factor: whether the amount or form of tender differed from past practices. As with New Penn, the form of tender, Debtor's payment by check covering a variety of invoices, did not vary from the Pre-Preference Period to the Preference Period.

  The Court considers together the third and fourth factors: whether the debtor or creditor engaged in any unusual collection or payment activity, and the circumstances under which the payment was made. Here, as with New Penn, the Court finds that YRC did not engage in any unusual collection activity. YRC's Credit Risk Manager and former Billing Supervisor, Michelle Gage, explained YRC's collections process. According to Ms. Gage, YRC's standard contractual terms required the Debtor to pay each invoice on or before 15 days from the date of the invoice; however, the contractual terms were rarely, if ever, followed. In the event YRC did not receive payment for an invoice within 19 days, YRC would issue a letter to the Debtor asking for payment. If payment did not follow within 26 days from the invoice date, YRC would make a courtesy call to the Debtor. According to Ms. Gage, YRC was very patient with clients such as the Debtor and did not engage in any collection activity other than letters and

phone calls. Ms. Gage testified that she had no knowledge of the Debtor's precarious financial position or impending bankruptcy, and that if she had, YRC's standard practice would have been to revoke the Debtor's credit or change the terms of the credit agreement. According to Ms. Gage, neither happened, nor did YRC engage in any collection activity aside from the letters and phone calls discussed above. The Court finds Ms. Gage's testimony to be credible.

Unlike the situation with New Penn, in which the Debtor paid invoices substantially earlier during the Preference Period than during the Pre-Preference Period, with YRC, the Debtor did not appear to change its payment practices. The invoices were never paid by the 15-day invoice due date, during the Pre-Preference Period or during the Preference Period. The number of days paid early, the number of days paid late, and the average payment dates during the Preference Period were all within 4 days of those during the Pre-Preference Period, which this Court finds to be sufficiently similar to constitute the Debtor's usual payment activity.

The Court has narrowly construed the parties' ordinary course of business, but nevertheless finds no significant alteration in any of the relevant *Sunset Sales* factors. The Court finds that YRC has met is burden of proving that the payments made during the Preference Period were made in the ordinary course of the parties' business, and the Trustee is not entitled to any recovery from YRC.

## CONCLUSION

For the reasons discussed above, New Penn's Trial Exhibits C and D and YRC's Trial Exhibits D and E are admitted into evidence. The Trustee may recover the total of the payments New Penn made during the Preference Period, $95,587.02, offset by the new value provided by New Penn to the Debtor, which the parties stipulate amounts to $21,939.28, yielding a total of $73,647.74. The Trustee is not entitled to any recovery from YRC. A separate judgment will enter in each adversary proceeding.

Dated this __11th__ day of December, 2013.

BY THE COURT:

_____
Howard R. Tallman, Chief Judge
United States Bankruptcy Court